SO ORDERED,

*Neil P. Olack*

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: October 20, 2016**

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

**ROBERT CHARLES ANDREWS,**                                 **CASE NO. 15-01253-NPO**

**DEBTOR.**                                                                              **CHAPTER 13**

**CROSS POINT CHURCH**                                                   **PLAINTIFF**

**VS.**                                                                      **ADV. PROC. NO. 15-00045-NPO**

**ROBERT CHARLES ANDREWS**                                  **DEFENDANT**

### MEMORANDUM OPINION AND ORDER
### ON THIRD AMENDED COMPLAINT TO DETERMINE THE
### DISCHARGEABILITY OF A DEBT PURSUANT TO 11 U.S.C. § 523(a)(4)

This matter came before the Court for trial (the "Trial") on August 31, 2016, on the Third

Amended Complaint to Determine the Dischargeability of a Debt Pursuant to 11 U.S.C.

§ 523(a)(4) (the "Adversary Complaint") (Adv. Dkt. 23)[1] filed by Cross Point Church and the

Amended Response to Third Amended Complaint to Determine the Dischargeability of a Debt

Pursuant to 11 U.S.C. § 523(a)(4) (the "Response") (Adv. Dkt. 25) filed by the debtor, Robert

Charles Andrews ("Andrews"), in the Adversary.  At Trial, Cross Point Church was represented

---

[1]  Citations to docket entries in the above-referenced adversary proceeding (the "Adversary") are cited as (Adv. Dkt. _____)" and citations to docket entries in the above-styled bankruptcy case are cited as "(Bankr. Dkt. _____)".

by Kenneth B. Rector, and Andrews was represented by J. Thomas Ash.  The Pretrial Order (Adv. Dkt. 36) was entered on August 19, 2016.  By stipulation, seventeen (17) exhibits were introduced into evidence at Trial by Cross Point Church, and four (4) exhibits were introduced by Andrews.[2]  Eight (8) witnesses testified at Trial, including Andrews.  Cross Point Church asked the Court to declare non-dischargeable a debt arising from a state court judgment against Andrews in the amount of $69,505.31, plus interest, for "converting money belonging to Cross Point Church."  (Church Ex. 16).  Cross Point Church contended that the debt is non-dischargeable under 11 U.S.C. § 523(a)(4).[3]  Having considered the pleadings, exhibits, and testimony presented at Trial, the Court finds as follows:[4]

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  Additionally, the parties have consented to the entry of a final judgment by this Court.  (Pretrial Order at 1-2).  Notice of the Trial was proper under the circumstances.

## Facts

Since 1964, Cross Point Church in Vicksburg, Mississippi (formerly First Methodist Protestant Church) has existed under the ecclesiastical jurisdiction of the Mississippi Conference

---

[2] Cross Point Church's exhibits are cited as "(Church Ex. ____)", and Andrews' exhibits are cited as "(Andrews Ex. ____)".  Because Cross Point Church did not introduce into evidence a document that it premarked as "Exhibit 8," its exhibit numbers are not consecutive.  Also, the first two (2) pages of "Church Ex. 11" are the same as "Andrews Ex. 3"; and "Church Ex. 9" is identical to "Andrews Ex. 2."

[3] From this point forward, all code sections refer to the Bankruptcy Code found at title 11 of the U.S. Code unless otherwise noted.

[4] Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, the following constitutes the findings of fact and conclusions of law of the Court.

of the Methodist Protestant Church (the "Conference"), headquartered in Collins, Mississippi.[5] Cross Point Church consists of approximately thirteen (13) acres of land, on which sits a sanctuary, Sunday school, meeting halls, and a daycare center. From 2001 through 2012, a span of approximately eleven (11) years, Andrews served as the pastor of Cross Point Church and a member of its Official Board (the "Board").[6] The present matter began as an intra-church dispute between the Conference, on the one hand, and Andrews and his followers, on the other hand, regarding Andrews' unsuccessful attempts to withdraw Cross Point Church from the denomination and the Conference's subsequent removal of Andrews as pastor. The church "schism" grew into a legal battle over the possession and control of Cross Point Church, including its pulpit, property, and other assets.

The Methodist Protestant Church, founded in 1828, is governed by the ecclesiastical rules and procedures of the *Constitution and Discipline of the Methodist Protestant Church* (Rev. 2008) (the "*Constitution*" or "*Discipline*") (Church Ex. 12). The Methodist Protestant Church is divided into geographical districts, including the Mississippi District. (Const. at 18; Discipline at 111). The *Constitution* requires each district to hold an annual conference (the "Annual Conference"), which is generally responsible for making sure that the local churches within that district operate pursuant to the rules and regulations of the *Discipline*. (Const. at 20-21). The Annual Conference is attended by "itinerant ministers belonging to the district" and one delegate

---

[5] Test. of Frazure at 10:20:00-10:30:00 (Aug. 31 2016). The Trial was not transcribed. The references to testimony are cited by the time stamp of the audio recording.

[6] Test. of Andrews at 11:15-11:20:00.

from each church.  (*Id*.).  The church year begins on the first Wednesday after the third Sunday in June, and the Annual Conference is held on the first day of the new church year in June.[7]

Each year in May, the local churches hold their last monthly meeting, called the "Annual Church Meeting," to discuss and vote on new officers, budget and financial reports, and other church business.  (Discipline at 47).  Additionally, the *Constitution* requires that the Methodist Protestant Church hold a general conference (the "General Conference") every four (4) years beginning May 2004.  The General Conference consists of delegates from all of the districts (Const. at 22) and, like the Annual Conference, elects a president and other officers.

In June, the Annual Conference elects, among other officers and committees, a president and a stationing committee consisting of two (2) ministers and two (2) lay delegates whose general role is to assign pastors to the local churches within the district.  The stationing committee is chaired by the president of the Conference.  In 2012, during the relevant time period, Billy Frazure ("Frazure") was president of the Conference for the Mississippi District, and Robert E. Quimby, Sr. ("Quimby") was its treasurer.[8]

According to Frazure's testimony at Trial, pastors work for the Conference but are paid by the local churches, which lack the authority to employ pastors on their own.[9]  With respect to Andrews' employment, Frazure testified that the Conference initially assigned Andrews as the pastor of Cross Point Church on September 8, 2002, and renewed his assignment in June of each year thereafter until early 2012.[10]  At Trial, Andrews agreed with Frazure about his initial

---

[7] Test. of Frazure at 10:20:00-10:30:00.

[8] *Id*.; Test. of Quimby at 10:50:00-11:00:00.

[9] Test. of Frazure at 10:20:00-10:30:00.

[10] *Id*.

assignment to Cross Point Church but disagreed that the Conference held ultimate responsibility for stationing pastors at the local churches.[11]   Several former Board members, all followers of Andrews, also disagreed with Frazure, testifying that congregations vote on their own pastors, and the Conference approves their choice in June.[12]   Frazure acknowledged that local churches vote on their pastors, but as Quimby explained, their vote was not binding on the Conference.[13]

At a meeting on September 20, 2011, the Board voted unanimously to begin the process of withdrawing Cross Point Church from the denomination and the Conference.  (Andrews Ex. 1 at 1-2).  "[D]ue to a series of unfortunate events, the leadership feels it is necessary to part ways with the Methodist Protestant denomination."  (*Id.*).   The procedure for a local church to withdraw from the denomination is set forth in the *Discipline* and requires, among other things, a three-fourths majority vote of all members voting. (Discipline at 49-50).  Frazure was informed of the vote by the Board, and, thereafter, met with Andrews and other members of the Board to seek a conciliation, but Andrews and the Board remained steadfast in their decision to withdraw Cross Point Church.[14]   Consequently, Frazure decided to terminate Andrews' assignment as pastor and met with the Conference's stationing committee to discuss his removal. The stationing committee then voted to replace Andrews with Marc Williams ("Williams").

In a one-page letter dated February 17, 2012, Frazure, acting as president of the Conference, informed Andrews that he was no longer assigned as pastor to Cross Point Church because of his alleged failure "to execute the Discipline and faithfully discharge all the duties

---

[11] Test. of Andrews at 11:15:00-11:25:00.

[12] Test. of Rouse at 11:30:00-12:00:00; Test. of Lisa Southern at 2:35:00-3:00:00.

[13] Test. of Quimby at 11:00:00-11:15:00.

[14] Test. of Frazure at 10:30:00-10:40:00.

belonging to the ministerial office." (the "First Removal Letter") (Church Ex. 1). The First Removal Letter cited as the basis for Andrews' termination Chapter 2, Article 4, Section Two, paragraph 1 of the *Discipline*. Frazure discovered that the First Removal Letter cited the wrong chapter of the *Discipline*, so he wrote Andrews a second one-page letter dated February 27, 2012 (the "Second Removal Letter") (Church Ex. 2), correcting the citation to Chapter 3, Article 4, Section Two, paragraph 1 and confirming the decision of the Conference to terminate his assignment effective February 17, 2012.

After consulting with an attorney, Andrews asked the Conference to reconsider its decision and, in the meantime, refused to vacate the premises of Cross Point Church or allow Williams to take over the pulpit.[15] He made only one concession; he abstained from voting at Board meetings. Interestingly, it was in late February, 2012, after he received the Second Removal Letter, that Andrews first moved into the church parsonage, which until then had been occupied by another church officer.[16]

In response to Andrews' request to reconsider his removal, Frazure and Ladon Dawson ("Dawson"), then president of the General Conference, wrote a third letter dated April 4, 2012 (the "Third Removal Letter") (Church Ex. 3), addressed to both Andrews and the Board. In the Third Removal Letter, which was considerably more detailed than the others, Frazure and Dawson cited thirteen (13) non-exclusive reasons for Andrews' removal, the first of which was his "[a]ttempts to lead [Cross Point Church] to other denominations and/or attempting to create an independent sovereignty and failing to provide pastoral services faithful to the Methodist Protestant Church." (*Id.* at 1.) They warned the Board that the Conference would view any

---

[15] Test. of Andrews at 11:15:00-11:25:00.

[16] *Id.*

action taken by Andrews after February 17, 2012, as "null and void and without any Church authority" and that any income or fees paid to Andrews after February 17, 2012, would have to be returned to Cross Point Church.  (*Id.*).  Frazure and Dawson also demanded a "complete accounting" of the proceeds from the sale of certain real property owned by Cross Point Church and ordered the Board to provide them with all business records of Cross Point Church, including its membership lists and all minutes from Board meetings for the years 2007-2011. (*Id.* at 2).

With respect to the withdrawal of Cross Point Church from the denomination, Frazure and Dawson informed the Board that the notice and voting procedures did not comply with the *Constitution* and instructed them to cease its efforts.  (*Id.*).  Any new effort to withdraw from the Conference would require Cross Point Church to pay the Conference at least $360,000.00, consisting of assessments due for the past four (4) years and proceeds from the sale of certain real property.  (*Id.* at 3).

All three (3) termination letters (the "Three Removal Letters") (Church Exs. 1-3) were hand-delivered to Andrews on their respective dates, and the Third Removal Letter also was hand-delivered to the Board.[17]  Andrews' termination lead to rival church factions.  Andrews and his followers—the Board and other church members (the "Dissenting Group")—ignored the Three Removal Letters because of their belief that Frazure and Dawson lacked authority to remove Andrews prior to the Annual Conference in June.[18]  Andrews refused to relinquish the

---

[17] Test. of Frazure at 10:30:00-10:40:00.

[18] Test. of Andrews at 11:15:00-12:00:00; Test. of Rouse at 1:30:00-1:40:00; Test. of Lisa Southern at 2:30:00-2:40:00.

pulpit to Williams, and the Board continued to pay Andrews his monthly salary.[19]   Neither Andrews nor the Board made any effort to appeal the Conference's decision to remove Andrews from Cross Point Church.

At a meeting on May 15, 2012, the Board voted to reappoint Andrews as pastor.  (Church Ex. 7).  At Cross Point Church's annual meeting on May 23, 2012, the last monthly meeting of the church year, the congregation voted 63-7 to retain Andrews as pastor for the 2012-2013 fiscal year. (Church Ex. 11; Andrews Ex. 3).  A stalemate between the Conference and Andrews continued throughout the spring and most of the summer, during which time Andrews continued to represent himself as pastor of Cross Point Church.

The Board argued that it became concerned about the financial welfare of Andrews and his family and on June 1, 2012—only a few weeks before the Annual Conference—voted to offer Andrews a written employment contract for the upcoming fiscal year.[20]   The Board asked Dagney Bagley ("Bagley"), senior advisor of the daycare, to draft the document.[21]   Bagley prepared the Pastoral Employment Contract (the "Employment Contract") (Church Ex. 15), and the Board and Andrews signed it on June 1, 2012.  It was never presented to the congregation for a vote.

The two-page, single-spaced Employment Contract retained Andrews as pastor from June 1, 2012 until May 31, 2013, but did not specify the amount of his compensation.  Two provisions pertained to the payment of his salary after his employment ended:  (1) his voluntary resignation as pastor would entitle him to his salary and benefits up to the resignation date, provided that he

---

[19] Test. of Andrews at 11:30:00-11:40:00.

[20] Test. of Stubbs at 1:40:00-2:00:00.

[21] Test. of Bagley at 2:25:00-2:30:00.

gave at least one month's notice to the Board; and (2) his involuntary removal by the Conference would entitle him to the balance of the year's salary. Andrews testified that when he signed the Employment Contract on June 1, 2012, he did not anticipate leaving Cross Point Church, notwithstanding the Three Removal Letters, because of the congregational vote to retain him as pastor on May 23, 2012.[22] He also testified that he believed the Board had the authority to enter into the Employment Contract for that same reason.

The Annual Conference took place in Collins, Mississippi, on June 20-22, 2012. (Church Ex. 14 at 1, 12). On the first day of the Annual Conference, June 20, 2012, a hearing was held before the Ecclesiastical Board of the Conference at the request of Andrews and the Dissenting Group to withdraw Cross Point Church from the Conference. (*Id.* at 13). Frazure, Dawson, and another Conference officer presided over the hearing. (*Id.*). Andrews and the Dissenting Group were represented by counsel at the hearing, during which witnesses testified and exhibits were introduced into evidence. (*Id.*). At the conclusion of the hearing, the Conference unanimously voted not to allow the withdrawal. The scope of this hearing was limited to the withdrawal of Cross Point Church from the Conference and denomination and did not specifically involve Andrews' removal as pastor of Cross Point Church.[23] Nevertheless, Andrews and the Dissenting Group considered the issues to be intertwined.[24]

The day after the Conference voted against Cross Point Church's withdrawal from the Conference and denomination, June 21, 2012, a special meeting of the Board was held to discuss Andrews' removal as pastor. (Church Ex. 9; Andrews Ex. 2). Andrews did not attend that

---

[22] Test. of Andrews at 3:00:00-3:10:00.

[23] Test. of Frazure at 10:30:00-10:40:00.

[24] Test. of Andrews at 11:30:00-11:35:00; Test. of Rouse at 1:30:00-1:40:00.

meeting but was physically present elsewhere on the premises.[25]  The Board voted unanimously to pay Andrews according to the provision in the Employment Contract that entitled him to the balance of the year's salary upon his removal as pastor by the Conference.  (*Id.*).  The tension and volatility at Cross Point Church is demonstrated by what happened next.  At the close of the Board meeting, someone called the police to report items being stolen from Cross Point Church.  (*Id.*).  Upon their arrival, the police officers asked to speak to Andrews, but it does not appear that he or anyone else was arrested.

Two (2) checks dated June 21, 2012, were drawn against Cross Point Church's checking account in the amounts of $52,518.03 and $16,987.28 (Church Exs. 4 & 5).  Both checks were signed by Lisa Southern ("Southern"), the treasurer of Cross Point Church, and Tina Stubbs ("Stubbs"), a member of the Board, and the total amount represented the balance of Andrews' salary and taxes for the 2012-2013 fiscal year.  (Church Exs. 4-5).  This lump-sum expenditure of $69,505.31 was not in the annual budget and was never approved by the congregation.[26]

Deposits in the checking account in question consisted of tithes to support the operations of Cross Point Church and other offerings.  Withdrawals from the checking account required two (2) authorized signatures.[27]  Signatories on the account with the ability to write checks included Andrews, Southern, and Stubbs.  Southern signed most of the checks herself and often used a facsimile rubber stamp of Andrews' signature for the second authorized signature.  Stubbs signed checks when necessary, which was not routinely.[28]

---

[25] Test. of Rouse at 1:30:00-1:40:00.

[26] Test. of Quimby at 11:00:00-11:15:00; Test. of Rouse at 1:40:00-2:00:00.

[27] Test. of Lisa Southern at 2:30:00-2:40:00.

[28] Test. of Stubbs at 2:00:00-2:20:00.

Andrews endorsed and deposited both checks into his personal checking account (Pretrial Order at 7). Andrews admitted at Trial that as a Board member, pastor, and signatory of the checking account of Cross Point Church, he was entrusted to be a good steward of Cross Point Church's funds.[29]

On or about June 21, 2012, Andrews and several Board members left Cross Point Church, locking up the facilities and taking the keys and certain records with them.[30] Andrews moved out of the parsonage, and did not perform any pastoral services for Cross Point Church after that date.[31] The manner of the Dissenting Group's departure left the current church members without access to any of the facilities, and Cross Point Church remained vacant for approximately six (6) weeks.

On August 2, 2012, six (6) current members of Cross Point Church (the "Current Members") filed a complaint (the "County Court Complaint") (Church Ex. 17) in the County Court of Warren County, Mississippi (the "County Court"), Cause No. 12,0978-CO, against Andrews and eight (8) former officers and/or Board members of Cross Point Church for the return of church records, keys, and other property, including the $52,518.03 paid to Andrews[32] (the "County Court Action"). In the County Court Complaint, the Current Members requested injunctive relief and asserted causes of action for wrongful conversion, misappropriation of funds, civil conspiracy, and malfeasance of office. Coincidentally, also on August 2, 2012, the Dissenting Group gathered at the Auto 1 Stop, Inc. to sign a petition in support of Cross Point

---

[29] Test. of Andrews at 11:50:00-12:00:00.

[30] *Id*. at 11:30:00-11:40:00; Test. of Lisa Southern at 2:35:00-2:45:00.

[31] Test. of Andrews at 11:30:00-11:30:00.

[32] The County Court Complaint did not mention the second check in the amount of $16,987.28.

Church's withdrawal from the Methodist Protestant Church and Andrews' reinstatement as its pastor (Andrews Ex. 4).

On August 9, 2012, the County Court entered the Preliminary Injunction (Church Ex. 16), pursuant to the agreement of the parties, providing for the management of Cross Point Church until the legal issues were resolved. The Preliminary Injunction, among other things, awarded exclusive use and possession of the property of Cross Point Church to the Current Members and ordered Andrews and the Dissenting Group to surrender all keys and security passwords to the Current Members. (Church Ex. 16). The County Court also appointed an attorney as special master to conduct an investigation and accounting. Additionally, the County Court ordered all assets of Cross Point Church to be frozen and funds not to be spent until a trial could be held, except for routine operating expenditures of the church and day care center. By August 12, 2012, Williams had finally taken possession and control of Cross Point Church and presided over a meeting of the Board, consisting of Current Members. (Church Ex. 10).

On or about August 20, 2012, Andrews and the Dissenting Group formed "Elevate Church," unaffiliated with the Methodist Protestant Church.[33] Andrews testified at Trial that there was no money in the treasury of Elevate Church at that time, and Elevate Church did not pay him a salary during its first year of its existence. Andrews testified at Trial that he freely spent the $69,505.03 paid to him from Cross Point Church's account.[34]

After a non-jury trial on December 10, 2013, the County Court realigned the parties to conform the pleadings to the proof, designating Cross Point Church as the sole plaintiff and Andrews as the sole defendant (Church Ex. 16). The County Court heard testimony from

---

[33] Test. of Andrews at 11:30:00-11:40:00.

[34] *Id.*

Frazure, Dawson, Quimby, Andrews, and Southern and then rendered a three-page Judgment (the "County Court Judgment") (*Id.*) on January 9, 2014. The County Court ruled that Andrews had "committed conversion, an intentional tort, by converting money belonging to Cross Point Church" and awarded Cross Point Church $69,505.31, together with prejudgment interest from June 21, 2012, at the rate of eight percent (8%) and post-judgment interest per annum at the rate of eight percent (8%) until paid in full. (*Id.*). Later, on August 19, 2014, the County Court adopted the Plaintiff's Findings of Fact and Conclusions of Law (the "Findings of Fact") (Church Ex. 18) as its own. Of relevance to this matter, the County Court found that "[t]he money of the church was wrongfully possessed under the control of Andrews who refused to return the church's money." (*Id.* at 9). The County Court noted that "Andrews may feel his intentional refusal to return the church's money is right but nevertheless his intentions are wrongful and intentional as to the property of the church." (*Id.* at 9-10). As to the sufficiency of the evidence, the County Court also noted that "the evidence in this matter goes beyond a preponderance of the evidence and constitutes clear and convincing evidence." (*Id.* at 10).

After Cross Point Church attempted to garnish Andrews' personal checking account, Andrews filed a petition for relief under chapter 13 of the Bankruptcy Code on April 16, 2015.[35] (Bankr. Dkt. 1). He listed a debt to Cross Point Church in the amount of $69,505.31 in Schedule F—Creditors Holding Unsecured Nonpriority Claims (Bankr. Dkt. 4 at 11) of his bankruptcy schedules and did not identify it as contingent, disputed, or unliquidated.

Cross Point Church filed the Adversary Complaint against Andrews on October 27, 2015. In the Adversary Complaint, Cross Point Church alleged that the debt of $69,505.31, plus pre- and post-judgment interest at the annual rate of eight percent (8%), is non-dischargeable on the

---

[35] *Id.* at 11:40:00-11:50:00.

ground that the debt resulted from fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

On November 9, 2015, Andrews filed the Response, admitting the existence of the debt but otherwise denying any wrongdoing. At Trial, Cross Point Church abandoned the larceny prong of § 523(a)(4) as inapplicable, pursuing only the "defalcation while acting in a fiduciary capacity" and "embezzlement" prongs of their nondischargeability claim.

## Discussion

### A.    Introduction

The facts in the Adversary are largely undisputed. The Board and Andrews chose to ignore the authority of the Conference to oust Andrews as the pastor of Cross Point Church. The Board and Andrews subsequently entered into the Employment Contract, which Andrews could not reasonably be expected to perform since he had already been removed by the Conference. Pursuant to the Employment Contract, the Board chose to pay Andrews $69,505.31—the day after the Conference rejected the Dissenting Group's request to withdraw Cross Point Church from the denomination. Andrews, for his part, chose to accept the checks, endorse them, deposit them into his personal account, and spend them, despite the Conference's position and the County Court's Preliminary Injunction.

In the Adversary, with Frazure having served the Three Removal Letters on Andrews, the Conference having held a hearing and rejected the Dissenting Group's attempt to withdraw Cross Point Church from the denomination, and the County Court having issued the Preliminary Injunction, County Court Judgment, and Findings of Fact, Andrews' defense requires this Court to revisit his choices over the past five (5) years. In doing so, however, this Court declines to litigate the church "schism" because it would require resolution of a religious dispute.

Moreover, the Court will begin its analysis of the dischargeability of this debt under § 523(a)(4) with the Preliminary Injunction, County Court Judgment, and Findings of Fact and will accept as binding the determination of the County Court that Andrews converted $69,505.31 belonging to Cross Point Church. The question then for this Court is whether the conversion met the scienter requirement of either a defalcation while acting in a fiduciary capacity or an embezzlement under § 523(a)(4).

## B.    *Rooker-Feldman* Doctrine and Collateral Estoppel

Cross Point Church asserts that the County Court Judgment supports a finding of non-dischargeability without the need for any additional testimony or other evidence. The Court, therefore, considers as a preliminary matter the applicability of the closely-related doctrines of *Rooker-Feldman*[36] and collateral estoppel, also known as issue preclusion.

The ultimate determination of the dischargeability of a debt under bankruptcy law rests within the exclusive jurisdiction of the bankruptcy court, but the doctrines of *Rooker-Feldman* and collateral estoppel prevent a bankruptcy court from reconsidering the same facts and issues litigated by a state court. *Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 349-50 (5th Cir. 2004)*; Gauthier v. Cont'l Diving Servs. Inc.*, 831 F.2d 559, 561 (5th Cir. 1987). Thus, even though non-dischargeability is "independent of the issue of the underlying claim's validity, which is determined by state law" these doctrines can provide an alternative basis to satisfy the elements of a non-dischargeability claim. *Grogan v. Garner*, 498 U.S. 279, 280 (1991); *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005).

The *Rooker-Feldman* doctrine bars a bankruptcy court from reviewing a state court judgment because "inferior federal courts do not have the power to modify or reverse state

---

[36] The doctrine derives from two (2) U.S. Supreme Court decisions, *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Ct. of App. v. Feldman*, 460 U.S. 462 (1983).

county judgments." *Union Planters Bank v. Salih*, 369 F.3d 457, 462 (5th Cir. 200-4) (quotation omitted).   The Fifth Circuit Court of Appeals has held, however, that a bankruptcy court considering a state court money judgment is not barred from conducting its own inquiry into the dischargeability of the debt. *Carey Lumber Co. v. Bell*, 615 F.2d 370, 377 (5th Cir. 1980).

As to the preclusive effect of a state court judgment under the principle of collateral estoppel, federal courts must apply whatever preclusive effect a court of the same state that rendered the judgment would afford that judgment. *Shimon v. Sewerage & Water Bd. of New Orleans*, 565 F.3d 195, 199 (5th Cir. 2009) (citing *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1980)).  Because the County Court Judgment against Andrews was entered by a Mississippi state court, this Court applies the Mississippi law of issue preclusion.  *Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997).  Under Mississippi law, a party is collaterally estopped from raising an issue that was: "(1) actually litigated in the former action; (2) determined by the former action; and (3) essential to the judgment in the former action."  *Gibson v. Williams, Williams & Montgomery, P.A.*, 186 So. 3d 836, 845 (Miss. 2016) (citation omitted).

The record in the Adversary demonstrates that Andrews and Cross Point Church were opposing parties in the County Court Action and that Andrews' negotiation of the checks was as essential to the entry of the County Court Judgment, as it is to any judgment rendered in the Adversary. The County Court heard testimony from multiple witnesses, including Andrews himself, and admitted documentary evidence.  After rendering the County Court Judgment, the County Court adopted the extensive Findings of Fact.

With respect to Cross Point Church's contention that the facts and issues litigated in the County Court Action established all of the elements of its nondischargeability claim, the Court

finds that they do not mirror those required for a determination of nondischargeability under § 523(a)(4). In the County Court Action, Cross Point Church had the burden of proving the tort of conversion, which involves "a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand." *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 772-73 (Miss. 2004) (quoting *Smith v. Franklin Custodian Funds, Inc*., 726 So. 2d 144, 149 (Miss. 1998)). The County Court found each of the elements of a conversion present: "The money of [Cross Point Church] was wrongfully possessed under the control of Andrews who refused to return the church's money." (Church Ex. 18 at 9). The County Court's findings are conclusive and may not be disturbed by this Court. They do not equate, however, to a finding that Andrews acted with the requisite culpable state of mind to establish a nondischargeability claim under § 523(a)(4).

Although conversion is an intentional tort in Mississippi, not all conversions are committed intentionally, recklessly, or with fraudulent intent.[37] In Mississippi, an individual may be liable for the tort of conversion even when she or he is unaware that someone else has superior ownerships rights in the property. *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987). Indeed, the County Court noted, without expressly finding, that "Andrews may feel his intentional refusal to return the church's money is right" but nevertheless concluded that Andrews committed the tort of conversion because "his intentions [were] wrongful and intentional as to the property of the church." (Church Ex. 18 at 9-10); *see also Greenline Equip. Co v. Covington Cty. Bank*, 873 So. 2d 950, 958 (Miss. 2002) ("Where one acquires possession

---

[37] The scienter requirement of the nondischargeability claims asserted by Cross Point Church under § 523(a)(4) are discussed in section D of this Opinion.

of property in a lawful manner . . . his refusal to relinquish possession or control over the property after a demand by [p]laintiff gives rise to the action [of conversion].").

There also was no specific finding by the County Court that Andrews converted the funds while acting in a fiduciary capacity. Such findings were unnecessary under Mississippi law because conversion does not require proof that the wrongdoer owed a fiduciary duty to the rightful property owner. *See Covington Cty. Bank v. Magee*, 177 So. 3d 826, 829 (Miss. 2015) (holding that conversion exists whenever there is an intent to exercise dominion or control over goods that is inconsistent with the true owner's right). In rendering the County Court Judgment and Findings of Fact, the County Court likely did not consider federal bankruptcy standards for the nondischargeability of a debt under § 523(a)(4). *See Dennis v. Dennis (In re Dennis)*, 25 F.3d 274, 277-78 (5th Cir. 1994) (noting that bankruptcy courts must look beyond labels given to obligations by state courts because they generally do not do so with federal bankruptcy law in mind). Both Andrews' state of mind and fiduciary capacity for purposes of § 523(a)(4) cannot be determined by collateral estoppel but require the Court to look beyond the County Court Judgment and Findings of Fact, engage in a review of the evidence presented at Trial, and render findings not considered by the County Court. In summary, the Court finds that the doctrines of *Rooker-Feldman* and collateral estoppel apply but the scope of their application is circumscribed by the particularized findings of the County Court and does not reach all of the elements of Cross Point Church's nondischargeability claim. *See Marine Shale Processors, Inc. v. EPA*, 81 F.3d 1371, 1379 (5th Cir. 1996).

## C.    Ecclesiastical Abstention Doctrine

Even in the absence of the County Court Action, this Court would lack authority to revisit the removal of Andrews as pastor of Cross Point Church because of the "ecclesiastical abstention

doctrine," first announced by the Supreme Court in *Watson v. Jones*, 80 U.S. 679 (1871). The ecclesiastical abstention doctrine is based on the Free Exercise and Establishment Clauses of the First Amendment to the U.S. Constitution[38] and "severely circumscribe[] the role that civil courts may play in resolving church property disputes." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). Simply put, the First Amendment forbids civil courts from inquiring into and resolving ecclesiastical disputes, defined as including matters that concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . ." *Watson*, 80 U.S. at 733; *see also Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976) (defining ecclesiastical matters as "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law").

The dispute concerning whether Andrews' removal as pastor of Cross Point Church followed proper procedures is purely ecclesiastical in nature. Adjudicating who should preach from the pulpit of Cross Point Church is clearly beyond the authority of this Court.

> [T]he First . . . Amendment[] permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the [U.S.] Constitution requires that civil courts accept their decisions as binding upon them.

*Milivojevich*, 426 U.S. at 724-25.

This is not to say that all disputes involving church property fall within the ecclesiastical abstention doctrine. The First Amendment does not grant religious institutions unlimited autonomy, and courts may use "neutral principles of law" to resolve controversies between religious institutions and their parishioners. *Jones v. Wolf*, 433 U.S. 595, 602-05 (1979). Thus,

---

[38] The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I.

the doctrine does not preclude this Court from adjudicating the nondischargeability issue raised

by Cross Point Church, and no party has suggested otherwise.

**D.**      **§ 523(a)(4)**

A central purpose of the Bankruptcy Code is to provide debtors with a "fresh start," but

this new beginning is reserved for the "honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-

87. "The statutory provisions governing nondischargeability reflect a congressional decision to

exclude from the general policy of discharge certain categories of debt . . . ." *Id.* at 287. In order

to prevail, the party asserting the exception to discharge must prove that the debt is

nondischargeable by a preponderance of the evidence. *Id.* at 291. Because of the considerable

consequences to a debtor who fails to achieve discharge, exceptions to discharge "are generally

to be 'narrowly construed . . . against the creditor' and in favor of the bankrupt." *Boyle v.

Abilene Lumber, Inc. (In re Boyle)*, 819 F.2d 583, 588 (5th Cir. 1987), *superseded by state

construction funds statute as recognized by Ratliff Ready-Mix, L.P. v. Pledger (In re Pledger)*,

592 F. App'x 296, 300 (5th Cir. 2015). Here, Cross Point Church invokes the exception to

discharge under § 523(a)(4), which provides, in part, as follows:

> (a)      A discharge under section . . . 1328(b) of this title does not discharge an
> individual debtor from any debt—
>
> * * *
>
>           (4)      for fraud or defalcation while acting in a fiduciary capacity,
> embezzlement, or larceny . . . .

11 U.S.C. § 523(a)(4). In construing this exception to discharge, the Fifth Circuit has noted that

§ 523(a)(4) was "intended to reach those debts incurred through abuses of fiduciary positions and

through active misconduct whereby a debtor has deprived others of their property by criminal

acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Boyle*, 819 F.2d at 588.

The phrase "while acting in a fiduciary capacity" applies only to "fraud or defalcation"; embezzlement and larceny are separate grounds for non-dischargeability under § 523(a)(4), and, thus, are independent of the existence of a fiduciary relationship. Having abandoned its allegation that the debt resulted from larceny,[39] Cross Point Church can prevail under § 523(a)(4) if it can establish that the debt arose either from (1) fraud or defalcation while acting in a fiduciary capacity or (2) embezzlement.

### 1. Defalcation While Acting in a Fiduciary Capacity

"Determining whether a debtor committed fraud or defalcation while acting in a fiduciary capacity is a two-step process." *Interstate Plywood Co. v. Blankenship (In re Blankenship)*, 525 B.R. 629, 640 (Bankr. N.D. Miss. 2015) (citation omitted). The first step is proof of the existence of a fiduciary relationship. *Id.* (citing *Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 879 (5th Cir. 1982)). "Second, some type of fraud or defalcation must have occurred during the fiduciary relationship." *Id.* (citing *In re Chavez*, 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992)).

### a. "Acting in a Fiduciary Capacity"

There is no definition of "fiduciary capacity" in the Bankruptcy Code. The Fifth Circuit has construed the "fiduciary capacity" requirement as applying to "technical trusts" or to traditional fiduciary relationships involving trust-type obligations imposed by statute or common law. *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998). There need

---

[39] Larceny requires a felonious intent at the time of the taking of property. 4 COLLIER ON BANKRUPTCY ¶ 523.10[2] (16th ed. 2016). Other than the manner in which funds come into possession, larceny does not differ from embezzlement. *Id.*

not be a formal, written agreement creating the express-trust arrangement; the provision applies to fiduciary relationships established by law, so long as the fiduciary relationship existed prior to the alleged wrongdoing. *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir. 1993). Whether someone acted in a fiduciary capacity under § 523(a)(4) is governed by federal common law although state law is important in determining whether a trust obligation exists. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619-20 (5th Cir. 2011). Relationships that are characterized as fiduciary in nature under state law may not necessarily amount to a fiduciary capacity under § 523(a)(4). *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012).

In Mississippi, fiduciary relationships can arise in a variety of contexts. "Traditional fiduciary relationships are found in cases of trustee and beneficiary, partners, principal and agents, guardian and ward, managing directors and corporation." *Robley v. Blue Cross/Blue Shield of Miss.*, 935 So. 2d 990, 994 (Miss. 2006) (citation omitted). Mississippi also recognizes informal fiduciary relationships "in a legal, moral, domestic, or personal context, where there appears on the one side an overmastering influence or, on the other, weakness, dependency or trust, justifiably reposed." *Lowery v. Guaranty Bank & Trust Co*., 592 So. 2d 79, 83 (Miss. 1991) (quotations omitted).

Andrews admitted at Trial that as pastor, officer, and Board member, he owed a fiduciary duty to Cross Point Church to safeguard its funds. Under Mississippi law, corporate officers owe fiduciary duties to the corporations they serve, and they may not allow their personal interests to prevail over the interests of the corporation. *Fought v. Morris*, 543 So. 2d 167, 171 (Miss. 1989); *Home Tel. Co. v. Darley*, 355 F. Supp. 992, 999 (N.D. Miss. 1973). The Fifth Circuit has also recognized that an officer of a corporation stands in a fiduciary capacity to the corporation.

*Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir. 1990).  The Court concludes that Andrews owed fiduciary duties to Cross Point Church for purposes of § 523(a)(4) in his capacity as pastor, officer, and Board member.  The degree of control exercised by Andrews over Cross Point Church and its checking account supports this finding.

### b.      Defalcation

Defalcation under § 523(a)(4) requires a culpable state of mind involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013).  The Supreme Court in *Bullock* defined defalcation to include not only conduct that the fiduciary knows is improper but also "reckless conduct of the kind that the criminal law often treats as the equivalent" and "reckless conduct of the kind set forth in the Model Penal Code."  *Id.*

> Where actual knowledge of wrongdoing is lacking," there may be a defalcation "if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty. . . . That risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."

*Id.* at 1759-60 (citation omitted) (quotations omitted).

Applying *Bullock*'s "reckless" standard to the facts presented in the Adversary, the Court finds that Andrews committed a defalcation within the meaning of § 523(a)(4).  Andrews testified that he was aware he was "on the way out of the door"[40] when he deposited the checks and spent the funds.  Indeed, the evidence at Trial established that Andrews knew on February 17, 2012, that the Conference had removed him as pastor of Cross Point Church and that he was present at the Conference on June 20, 2012, when it denied the Dissenting Group's request to

---

[40] Test. of Andrews at 11:45:00 – 11:50:00.

withdraw Cross Point Church from the denomination and Conference. Despite these events, Andrews converted $69,505.31, funds that he and the Board tried to disguise as severance pay.

Andrews' defenses to the defalcation were that: (1) the congregation voted to approve his employment as pastor for the upcoming fiscal year; (2) that he was not present when the Board voted to approve the Employment Contract; and (3) that the Preliminary Injunction did not freeze his personal assets. Although the congregation may have voted in favor of his reappointment, the vote was of limited importance because the Conference, not the congregation, held the ultimate responsibility for stationing pastors. *See Milivojevich*, 426 U.S. at 724-25 (requiring civil courts, with respect to hierarchical religious organizations, to accept decisions of tribunals created for adjudicating disputes "over the government and direction of subordinate bodies . . . as binding upon them"). Cross Point Church is not a congregational church where there is no binding higher authority but is instead a hierarchical church governed by the Conference. Andrews, having served as pastor of Cross Point Church for approximately eleven (11) years and having attended at least the same number of Annual Conferences in that capacity, cannot credibly claim that he was unaware of the governance of Cross Point Church.

As to the level of his involvement at the meetings when the Board approved the Employment Contract and the issuance of the checks, Andrews' physical absence did not mean he exerted no influence over the Board. After all, he was present on the premises that day. Since September, 2011, the Board members had aligned themselves with Andrews so firmly that they followed him to Elevate Church. The Court does not believe his influence required his presence. Moreover, the Board had a financial incentive: by approving the payment of $69,505.31, they relieved themselves of the financial burden of paying his salary at Elevate Church for at least a year.

Finally, as to the Preliminary Injunction, it is true that the County Court did not specifically freeze Andrews' assets and that Andrews may not have violated the Preliminary Injunction when he spent the funds. But the purpose of the Preliminary Injunction, however, was to act as a stop-gap measure until resolution of the property dispute at trial. It did not purport to absolve Andrews of his fiduciary obligation to Cross Point Church or to grant him permission to spend the funds with impunity.

Andrews' self-serving testimony that he had no specific intent to misappropriate funds belonging to Cross Point Church does not resolve the question in his favor because the Supreme Court in *Bullock* did not impose a requirement of specific intent. Regardless, the Court did not find Andrews to be a credible witness at Trial. He refused to answer "yes" or "no" to simple questions about the circumstances surrounding Williams' appointment as pastor of Cross Point Church.[41] Initially, he denied that the Conference withdrew his appointment, arguing over the definitions of "withdraw" and "terminate."[42] Only when he was shown the First Removal Letter did he relent that there was no meaningful difference between the two (2) terms. Also, he continued to challenge factual determinations made by the County Court and the Conference, namely whether his removal as pastor was proper.

Andrews' conduct did not involve simple or even inexcusable negligence, which would not give rise to the level of culpability required by the standard of recklessness, but an extreme departure from the standard of care. His own testimony establishes his awareness of the volatile situation he helped create at Cross Point Church and the "substantial and unjustifiable" risk to Cross Point Church that his conversion of its funds would violate his fiduciary duty.

---

[41] *Id.* at 11:18:00 – 11:20:00.

[42] *Id.* at 11:25:00 – 11:27:00.

Accordingly, the Court finds that the debt owed by Andrews to Cross Point Church in the amount of $69,505.31 should be excepted from discharge as a debt for a defalcation under § 523(a)(4).

### 2. Embezzlement

The exception to discharge under § 523(a)(4) also applies if Andrews' actions constituted "embezzlement." For the purposes of § 523(a)(4), embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller v. J.B. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (quotation omitted). "Embezzlement, however, is not limited to situations in which one person is entrusted with the property of another. It also applies where . . . a person lawfully obtains property, but then fraudulently appropriates it for his or her own use." *Powers v. Caremark Inc. (In re Power)*, 261 F. App'x 719, 723 (5th Cir. 2008) (citation omitted). "Given that a debtor has lawful control of the property, embezzlement then requires three elements: (1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent." *Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006).

The key to a finding of embezzlement under § 523(a)(4) is fraudulent intent. "Fraudulent intent is an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property." *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 778 (Bankr. S.D. Tex. 2008) (quotation omitted). "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *First Nat'l Bank of Midlothian v. Harrell (In re Harrell)*, 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988) (citation omitted).

The circumstantial evidence indicates that Andrews converted funds of Cross Point Church with fraudulent intent. Again, his explanation is to disavow himself from the actions of

the Board because of his absence from the meeting that approved the Employment Contract and the vote of the congregation.  He argued he had reasonable grounds to believe he had the right to the funds because of the Employment Contract.  But his beliefs were not reasonable.  His willful blindness is no defense.

Andrews may not have signed the checks, but he endorsed and deposited them into his personal account and refused to return the funds to Cross Point Church even after he was made aware of the position of the Conference and the Preliminary Injunction.  By depriving Cross Point Church the use of its funds, he treated himself, and indirectly Elevate Church, to a year's salary.  "[A debtor] can wrongfully appropriate [personal property] while acting under an erroneous belief of entitlement."  *In re Miller*, 156 F.3d at 603.  The Court concludes that Andrews' use of the funds was performed with fraudulent intent and such usage constituted an embezzlement.

## Conclusion

Based on the foregoing, the Court concludes that the $69,505.31 debt owed to Cross Point Church should be excepted from discharge on the grounds that Andrews' conversion of the funds was a defalcation while acting in a fiduciary capacity and an embezzlement under § 523(a)(4).  When Andrews signed the Employment Contract and negotiated the checks, he was aware of his ouster from Cross Point Church.  At this juncture, the Conference had already made its position known in writing, and Andrews himself was present at the Annual Conference when the vote to sever Cross Point Church, from the denomination and Conference, failed.  Even after the County Court issued a Preliminary Injunction prohibiting all but routine expenditures of church funds, Andrews freely spent the funds belonging to Cross Point Church.  The choices Andrews made over the past five (5) years demonstrate that he acted recklessly with respect to

his fiduciary obligation to Cross Point Church. They also demonstrate a fraudulent intent sufficient to establish an embezzlement claim.  The Court reached this conclusion mindful that its findings could only supplement the findings made by the Conference and County Court, which are binding on this Court, and that its supplemental findings were made for the purpose of determining whether Cross Point Church satisfied the state of mind elements of § 523(a)(4).  A separate final judgment on the Adversary Complaint will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

##END OF OPINION##